v. Amerisource Bergen Corporation, et al. We'll let Council have a minute to come get settled at Council table. And when you do get up here, I would just remind everyone that there is a black switch on the right side of the lectern that raises and lowers the podium. So please do make sure you take a second to tilt the microphones towards yourself to make sure that we can hear you and don't miss a word of your arguments. Mr. Raymond, whenever you're ready. Good morning, Your Honors. May it please the Court, my name is Richard Raymond, and I represent Patsy Gallion, who is the plaintiff below and is the appellant here, a relator in a court of substantial sums on behalf of the United States. On this Court's de novo review, the pleadings, orders, and law inescapably demonstrate that the district court erroneously dismissed relator's complaint with prejudice, declined to reconsider, and declined to grant leave to amend. Reversal is warranted here even without a false claim for payment. Based on the reverse false claim cause of action under the False Claims Act and its intersection with the Affordable Care Act, which provides that retaining Medicare and Medicaid payments, to which the health care entity is not entitled, within 60 days of learning of an overpayment, constitutes an obligation back under the Reverse False Claims Act. So I'm saying, so are you stepping away from your affirmative claims of misrepresentation here? We are not, Your Honor. Okay. So you just, you're focusing right now on the I'm focusing right now on the interaction of the Reverse False Claims Act with the Affordable Care Act. I'll touch on the specific factual allegations as to false payments in a moment. So one of the strongest claims, it seems to me, of a reverse false claim, and maybe you would differ with me, but I thought one of the stronger ones was the audit with the 30 adjustments, nine of which were found to be overpayments from government payers that were moved to revenue. Is that a fair statement? It is a fair statement. And I guess what I'm wondering, as to any of those nine, is there, what is the evidence that the government payer was the Federal Government, and what is the evidence that says what happened after the audit? In other words, was there, what is the evidence that there was not a reconciliation of those claims at some point? Well, Your Honor, there was an internal investigation that specifically identified $49.9 million worth of overpayments based on the characterization of U.S. Bio as a long-term care pharmacy when it was actually a short-term care, and those were specifically identified as government allegations. There was also evidence that — Well, government, small g, right? I mean, what is the factual basis in the complaint to say that government means Federal Government or Medicare-slash-Medicaid? Well, the analysis that I referred to referred to government or other, Medicare, Medicaid, and Medicare replacement. So there are specific allegations that it's the Federal Government. Where is that allegation? Could you just give me a paragraph? Yes. It's in the appendix, page 65. No, the part that says it was in response to Judge Lynch's question about which governments we're talking about. I'm looking, I think, at page 65, but I don't see it. It's appendix, page 65, Your Honor. Yeah. Oh, I see there. It's in the left-hand column. Right. So what about commercial? There were some commercial overpayments that were affected as well, but — But I guess I'm wondering, I thought the question that Judge Lynch had was about the specific audit, but this is not the audit, right? No, this is — This is a different thing. This is a different thing, and I think — No, I guess that's my question is, I think what you're asking us to do is to infer from the fact that Medicare and Medicaid are included in this investigation, they must have been the subject of the audit to which Judge Lynch is referencing. I think it's highly likely. Wow. I mean, commercial, I'm just looking at here, let's take the last column, grand total, $23 million for commercial. Right. Set that aside. If you look at the others — And then $117 for government other. Right. So you're saying that because, what, there's such a small amount, relatively speaking, government other, that if you're talking about government, it must mean $49 million? Well, but the Medicare part is almost $50 million in this particular chart. It is, and it — And that's a motion to dismiss, right? I beg your pardon? And it's a motion to dismiss. Yes. So you're saying that because it's such a vastly overwhelming — the government portion of this is so vastly overwhelming in Medicare-Medicare that we should infer that the government or the audit, to the extent it's talking about the government, highly, highly likely it's talking about not the 0.2 percent of government other. Correct. Okay. Got it. So then let me proceed to the specific allegations of false statements, because notwithstanding the — I'm sorry, before you move there, can I just ask, with respect to the reverse FCA claim, when the statute seems reasonably clear, other circuits have said as much, do you think we have said that that's a thing yet? I haven't found a case where this circuit has, Your Honor. So I want to emphasize that the relator did allege numerous specific examples of overbilling and false claims to the government. There was the Cartesel at double the Veteran Administration contract price, the appendix at page 44. Eight false claims specifically identified by order number, fill date, amount charged to Medicare or Medicaid, their average wholesale price and amount charged, each hundreds of thousands of dollars above the — Help me out with the Cartesel. I'm sorry? Help me with the Cartesel. Yes. I'm a little confused about that. I mean, I guess you say government payers, e.g., the DOD — e.g. means for example, not I.E. So I guess you're alleging there that it was the DOD? It was the — there's a — at the appendix, page 44, there's a claim to the Veterans Administration. Yeah, where does it say that it's a claim to the Veterans Administration? Well, because it redacts out the veteran's name, but it says veteran. So we're supposed to assume that because it refers to veteran, the only people who would be having a database identifying somebody as a veteran is the VA? I think that's a logical conclusion.  In other words, if you're — if I happen to have served in the military, but I'm going to an ordinary hospital and paying with — through some private insurance, there's no reason why the insurer or the hospital or anyone else would have a veteran's I.D. number. Correct. As part of their files. Yeah. And then can I also ask you there, it just says the amount paid is $73,000. And it says in your allegations that the contracted rate was $35,000. And it says the defendants were billing the government payers a regular rate of $70,000. But of course, the amount paid isn't $70,000. It's $73,000. Three-something. Yes. So double the contract rate. It's like, what's the quantity? Like, I don't know, I'll make this up. How many treatments was this? We don't know, Your Honor. So I guess that's why I'm never — I had trouble understanding how this is alleging an overpayment. Because you've rounded the $73,000 to $70,000. You said they were billing $70,000, even though it says $73,000. But okay. Let's just say you've been rounding. But then how do we know that wasn't, like, I don't know, two treatments? I don't even know what a treatment is. Is it two doses of it? Is it two days of getting it? So it doesn't say, like, quantity. It does not, Your Honor. So I guess I don't even understand what to make of the CARTA cell. Well, let's move on from CARTA cell and address some of the others. Okay. There were eight false claims, as I mentioned, at Appendix 54. They were charged to Medicare or Medicaid. And those are alleged to be overpayments. There were three government claims identified by invoice number and date of service, linked to credits owed to TRICARE, Veterans Affairs, and the Department of Labor. That's at Appendix 54. And then, again, we have this pharmacy misclassification at Appendix 65. So we would respectfully submit that those are plenty of factual allegations. They're plenty of specificity. And the defendant's sort of ceaseless recitation that there weren't any is just not borne out by an objective, de novo review of the record. Could you help me out deciphering what you mentioned on Page 54? Just explain to me what we're supposed to make of that spreadsheet. Well, I'm not going to. Well, it is claims to TRICARE, Veterans Affairs, and the Department of Labor, invoice number, date of service, and their credits owing. Okay. So, and, again, you say it's charges to TRICARE? Yes. Where does it say that? At Appendix 54?  I'm looking at it. Yeah. And it's probably like a heading in a column I'm missing. Where does it say TRICARE? I don't have it right in front of me, Your Honor. I just. I mean, that was one of my problems. I say Medicare Part D, like the plan type. But, like, you just said, oh, this is TRICARE stuff. And I'm trying to figure out why would I. Are we looking at the three claims? I was looking at the stuff above there. Oh, I see. At the bottom.  You're talking about the small chart. Yes. Incorrect contract rate TRICARE. Yes. I see. I see. I thought you were talking about the large chart. No. No, the lower one. Okay. But, you see, I mean, what I think is hard to follow with this is if we just focus on those three claims, the allegation is claims like those above were later, which is the big chart, were later moved into revenue by the credit department. Then the following payments were adjusted using an adjustment form. There's a list of those payments. And then there is an example of an adjustment form. But what is the relationship between that adjustment form and these three overpayments? I believe the three overpayments stand on their own, Your Honor. Well, no, but the important thing is that they were adjusted using an adjustment form. I assume the adjustment means that these payment errors, rather than being corrected, were adjusted, meaning were basically stolen. That is, were basically recognized as revenue rather than being repaid. Yes. The complaint alleges that the accounting staff was told to sit on overpayments for 18 months or more and then convert them into revenue accounts, basically stealing the money that was owed. And this adjustment form on page 55 is for the second entry of the chart on the page 54, right? I believe that's correct, Your Honor. I believe that's the Department of Labor overpayment. I believe that's correct, Your Honor. Okay. I don't think we have any further questions right now, but you've reserved two minutes for rebuttal. Why don't we hear from your adversary? Thank you. Mr. Nelson. Thank you, Your Honors, and may it please the Court. My name is James Nelson. I represent the defendants. This Court should affirm because Relator failed to adequately allege any violation of the False Claims Act under the governing Rule 9b standard for two primary reasons. First, Relator's factually false claims fail because she does not identify a single false claim for payment submitted to the government, any government, including the federal government. What about this one right here? Maybe this is a reverse rather than a factual one. The one we were just talking about. On page 854, there's this little chart which states that there was a payment error, a Department of Labor overpayment of $8,122.73. And then it is alleged that claims like these were adjusted, which we're told means moved into revenue, using an adjustment form. And there on the next page, 855, is such an adjustment form. So why does that not constitute a specific example of an overpayment by the Department of Labor, which was recognized as such by U.S. BIO, but instead of being paid back, was then recognized as revenue? So I'm going to answer your question, Your Honor. One thing I'd like to point out is there's no allegation that this overpayment, quote-unquote, was based on any false claim for payment. So who cares? I know what your legal position is. Let's assume I disagree with that. Because it seems to me that if there is some overpayment, even if it is inadvertent and is not based on any false claim in the first place, that it becomes a reverse false claim if that money is knowingly retained rather than being repaid. So at least my thought for the moment, and you can argue it later, but for now, let's assume I disagree with you that there needs to have been an initial false claim. It seems to me if there were such a need, why would we even have such a thing as a reverse false claim at all? Because it's already covered by the false claim. But assuming for the moment that an inadvertent overpayment that instead of being recognized is intentionally retained by a payee of the government could constitute a reverse false claim, why does that not add up? And maybe that's the only one. I don't know. But that's an example that we were given. So explain to me why that does not show that. Yes, Your Honor. So focusing on Subsection G, the reverse false claim allegation. So this does not show for multiple reasons. First, it says claims like those above were moved into revenue. There's not even a conclusory allegation that these claims were moved to revenue, let alone any explanation under Rule 9b about how plaintiffs knew that. So it says claims like those above on A54. And then it says that they were moved into revenue. But there's no explanation about what that means. So there are inadvertent overpayments all the time. And then there are credits that are then credited towards later payments. The Joseph case that we cited involves this. There's other cases that involve this. Okay. But this is a motion to dismiss. Yes, Your Honor. Doesn't that make a difference? It does, but this — Do you have to win the 9b argument here in order for what you're saying to — this just seems like you're demanding a lot of toothiness in a motion to dismiss. Yes, Your Honor. And we are relying on Rule 9b. I think we went under Rule 8. Okay. So what happens if we think 9b doesn't apply to a reverse claim? Do you still win? Yes, I think we still win. Okay. Why don't you, when you're responding to me, assume that that's where we are, that 9b does not apply to a reverse claim? And why would you still prevail? Okay. So we're assuming that Rule 8 applies to a reverse claim. We still prevail. Well, this Court's case in O'Brien specifically says that the allegations, even for knowledge, which 9b doesn't apply to, there has to be a strong inference that knowledge actually took place. There's no allegations here at all that there was knowledge that it was improper to convert these to revenue. If it was credited to the government already, which is a common practice in these — in this area, and then the earlier overpayment was converted to revenue, there's no allegations at all about who did this, what their knowledge was, whether they did this intentionally. There's just an excerpt from an internal form. Is the defendant aware that governments do not audit the accounts regularly and, therefore, it was unlikely the fraud would be discovered? Defendants were aware. That's a conclusory assertion. There has to be some information. It sounds to me like you're resting on a very toothy motion-to-dismiss standard. Would you say that that's fair? Well, I guess I would push back on that, Your Honor, because knowledge and intentionality are elements of this claim. And this Court has specifically said on multiple occasions that saying defendants were aware or defendants knowingly did X is not sufficient to allege that element. Well, their own document here says this was an overpayment. And you're saying that, hypothetically, that overpayment might have been credited to the government or repaid to the government in some other way as a credit against some other bill to the government. And that is the reason why this particular overpayment could simply be recognized as revenue that was actually earned by U.S. BIO rather than what it looks like they thought it was, an overpayment. Well, again, Your Honor, the overpayment language, there's no allegation here that any of these overpayments were converted to revenue. It says claims like these, and then it lists three completely unrelated claims. There's no allegation in this chart, in this internal chart on the bottom of A54 or the top of A55, that there was any overpayment. So you're saying this is slippery language because, again, if we look at the actual language of the complaint, which is indeed somewhat confusing, it says claims like the above, which is not even referring to this one, which is below, were later moved into revenue. Okay. But then it says the following overpayments were adjusted using an adjustment form, but it does not specifically say in the complaint that the adjustment was moving it into revenue. It also, there's no indication on any of these charts that any of these were overpayments, I think is also my issue. No, it's simply an overpayment. This is your document. It calls it an overpayment. Department of Labor overpayment is the one we're talking about. Invoice number 672802.01 on page A54 of the complaint. Yes, Your Honor. It says this is a Department of Labor overpayment. And then there is this a couple of years later adjustment form that says this form was used in all the adjustments transferring overpayments to revenues. And at any rate, if that is true, then that's exactly what happened here because this adjustment form is, relates to this, which was an overpayment. Now, if you guys knew it was an overpayment, and again, maybe there are all kinds of facts that could account for these things, I suppose, but I'm having a little trouble figuring out why the plaintiff needs to show at this stage in the complaint to negative any possible rationale that there could be when they're showing me something that is recognized by U.S. BIO as a Department of Labor overpayment, which they then say there is a form which was used in all the adjustments transferring overpayments to revenues, which relates to this particular overpayment and constitutes just such an adjustment. Now, I mean, so what am I missing? What is there that isn't available to show that this is a plausible allegation, in Twombly terms anyway, that U.S. BIO was aware that it had been overpaid and then confiscates that overpayment by an accounting adjustment, which one might think that the next step is refund check or something like that, or even refund credit, and maybe there is such a document that shows that there was a refund credit, but at the pleading stage, it seems to me what it looks like is obviously it was known that it was an overpayment because that's what you called it, and then that money is adjusted from an overpayment in a way that is alleged to be a transfer of the overpayment into revenue. So I have a couple of responses to that, Your Honor. Setting aside the requirements under this Court's case law for knowledge and intentionality, which I think are much more than is alleged here, but setting that aside, we still have issues.  Don't set it aside. Tell me about it. What is missing from the fact that it is alleged that this was an overpayment? Not that it was overpayment. They're not alleging it was an overpayment. They're saying we have a document where you acknowledge it was an overpayment, right? So what knowledge is missing? What knowledge and intentionality? The person who transferred it to revenue. When it was transferred to revenue, did that person recognize that it was an overpayment, A, and, B, that it had not been refunded? There's no even allegation here that it hadn't been refunded. But the person transferring it to revenue two years later would have to have some knowledge or intentionality that it was an overpayment that had not been refunded. And we don't believe that there's any allegations at all about that here. And under this Court's case law in O'Brien and other cases, knowledge like that is required for the person doing the allegedly fraudulent thing, which, as I understand it here, is the transferring of the revenue, as opposed to paying it back, which, again, there's no allegation here that it was not paid back. And on multiple occasions, I think it's four separate occasions, A50, A60, A65, A66, Relator doesn't even say that she knows they weren't paid back or that they weren't paid back. She just says, I am unaware of whether they were paid back. That's not an allegation. That's not even a conclusory allegation that refunds weren't made to the Federal Government. But I'll also mention materiality, which Relator did not even address in her first – in her opening brief, even though the district court did. It's clearly an element of a reverse false claim, just the same as a factual false claim. Materiality, here we have an overpayment of $8,000. There's no allegations at all, let alone meeting the high and demanding bar for materiality under the False Claims Act, that the government would have stopped paying or would have done anything differently than it did if they knew about this $8,000 that went into revenue, assuming, again, that it was not refunded. But $8,000 in the scope against the trillions of dollars of Federal budget is just the kind of thing that you'd say, ah, keep it. One of the three factors for materiality in this Court's case law is substantiality. That's insubstantial under this – under, like, clear case law from this Court under materiality. If it's insubstantial, the government – So you're saying if it were proved that this was intentionally hidden – no, I'm thinking of the – you know, the scam in Superman 1 where the bank tellers divert all the pennies from everybody's account and thereby make a lot of money. If that was the scheme, if it was a deliberate scheme to just say, well, whenever there's an overpayment that's below a certain amount, we're just going to keep it instead of turning it back to the government, that that is immaterial because there's no allegation that the government wanted that money back? Well, there are no allegations of materiality at all or argument on appeal that these were material, and that's clearly an element under United States – I just want to make sure I understand your argument. You're asking us to find as a matter of law that a knowing possession of $8,000 in overpayment would not be material, like, as a per se matter. Is that what you're asking us to do? No, Your Honor, not at all. Okay, so then explain to me or respond to Judge Lynch's question about why that $8,000 isn't sufficient for materiality. Yes, Your Honor. So under this Court's cases, Ascari from 2024 is one. Fifth Third Bank, 2023, is another one. The burden is on the plaintiff to allege in their complaint why it was material to the government's payment decision, why the thing that's being alleged is material. And our chief argument is that the plaintiff has clearly not satisfied that burden. So that would not be a per se ruling by this Court, that $8,000. What does the materiality have to relate to? Because it seems to me that what you're suggesting is, let's say there's an $8,000 overpayment. You're suggesting that the materiality would be – if the defendant retained it, would it be material to the government making different payments in the future? So if the allegation is withholding funds owed to the government, then the government is alleged to have paid a lot of money as well, and they could withhold funds. Let's say you had a reverse false claims case with a closed set of payments. So there's no ongoing contractual relationship. It's a one-off contract, and this company, U.S. Bioservices, gets and keeps wrongly a million dollars. And it all comes in one big batch. And they know that it's an overpayment, and they hide it to prevent it from future audits. But there's no ongoing business relationship. So there's no further inducement of the government sending more money. You're not suggesting that materiality could never be proved in that kind of a case because the government is not being tricked into sending them yet more overpayments, are you? I'm not suggesting it could never be proved, no, Your Honor. No, I guess that's what I'm asking because I think I'm hearing your argument as suggesting the retention of 8,000 can't be material because your opponent has not alleged that it's tricking the government into sending more money. Is that what you're arguing? Well, so I'm arguing that continued contractual relationships are relevant to materiality. Well, that's one way, I suppose, of tricking the government and making a material statement. But I would have thought in a reverse false claims act it would be material that they're not sending the 8,000 back. And they're tricking the government into not asking for the 8,000 back. Is that not a possible theory of materiality? If there was concealment on the part of, say, U.S. Bioservices. Assuming there was, and again, there are no allegations that there were. Unless there was an overpayment that everybody knew it was an overpayment, except the government. And then U.S. Bioservices engaged in accounting trickery so that no government auditor would ever discover the 8,000. Would that accounting trickery constitute materiality, give rise to materiality? I think it could if there were allegations of all of those things in the complaint, Your Honor. So that's why I'm a little at a loss as to why I thought you were arguing. Because the government will still send them money. Even if they know they got cheated out of aid, they're not going to slow down the $1 trillion program for aid grant. It seems like it's a different argument. I don't see why the materiality would not relate to the $8,000 repayment itself. Well, there's one point I may have misheard, Your Honor. So if the government was aware, for instance, of this, these two charts, and continued to pay and didn't demand repayment, I think that would clearly be relevant to materiality. Okay, that's fine. If the government says you cheated us, but we really don't care, then I guess that's not true. Well, and they've had this exact complaint since 2013, and there are no allegations of any response, which is a fact relevant to you. Well, I mean, you can't say materiality is not established whenever the government doesn't adopt a ketam case. I agree with that. It's a relevant factor, Your Honor, under Escobar. It's not a per se rule. But again, the other side has not, in their opening brief, even argued about materiality, which was an element that the district court found lacking, and thus waived it. One other thing. I will say this Court's – Okay, but if it's lacking, isn't that – does that speak to the idea of amending the complaint? Like if something could be argued? I mean, right? It certainly means that it's not futile. I certainly had to talk about the decision not to allow amendment of the complaint. It was – No, but I just – it's just you're – we have to come up with a coherent whole. Yes, Your Honor. And so if the fact is that you're resting on they didn't allege something and he thinks that he could, then does that counter against the idea of the propriety of finding that no need to amend? So to be clear, our argument is that they did not allege things that they had to allege. But we agree with the district court's decision, and it's reviewed for abusive discretion not to allow an amendment here because they actually had two opportunities to amend, and they saw all of these arguments in the pre-motion letter practice. And as this Court said in the Solomon decision, that's not an abusive discretion to not allow amendment if it's not requested before the opposition to the motion to dismiss, and they saw these arguments in the pre-motion letters. And you had made the lack of materiality argument in your pre-motion? Yes, Your Honor. Yes, Your Honor. That's my understanding. If you said you have materiality, a gap in your materiality allegations, and they didn't, if we agree with you that they didn't put in the second amendment of the complaint, then why ask them yet again? And on, yes, Your Honor, and all the other False Claims Act arguments that we made, but also they haven't even told this Court what they would do to amend. In their request to this Court, as far as challenging futility, there's no argument at all about what allegations they could or would add on any of the points that we've identified. One final thing on reverse false claims is that this Court in Gelbman specifically said that Rule 9b applies to reverse false claims under Subsection G, and it cited other precedential decisions of this Court doing the same thing. Okay, but, like, I'm assuming you're going to refer to Miller, right? But didn't the Miller footnote presume that there was an affirmative misstatement? So in that case, yes, Your Honor, there was an affirmative misstatement. So, like, you're asking us to come up with, like, a bright-line rule with another case that had a different animating concern to the point where the Court actually noted that animating concern, which I would read as that was an animating concern. So a situation that has another animating concern might produce a different result. Why is that wrong? So the Gelbman panel, I think, already looked at Miller and the other cases that cited and said reverse false claims under Subsection G do require 9b, just as a straight matter, not only in cases involving affirmative false claims. But even if you just look at this case, on page 2 of the reply brief, they allege that, and this is the quote on page 2 of the reply brief, most or all of the overpayments, most or all is the quote from page 2, were based on factually false claims, on the schemes to get more money from the government is what they call them. So if most or all of the reverse false claims are based on their factually false claims, then Rule 9b clearly has to apply to those claims. And I think that's emblematic of the lack of specificity in the complaint and in their briefing, that they can't even say whether there were any overpayments that were not the result of the alleged schemes or whether some had nothing to do with them. And they don't dispute, I think, under Gelbman and other cases, that if they have not plausibly alleged a factually false claim, they cannot get a reverse false claim based on an overpayment that was caused by the alleged factually false claim. And, you know, we haven't spent time discussing factually false claims. I'm happy to do it. The one point I'll make is this Court's case law is clear that you have to allege an actual claim for payment to the government, and they haven't done that. The best example they point to is this car-to-sell example. It's not a claim for payment to the government. It's an internal document that says how much the government paid. It doesn't say what the quantity of the drug was. It doesn't even say what the drug was. They say that that CPT code includes car-to-sell, but there are other drugs that it also includes. So it doesn't say car-to-sell. It doesn't say what the quantity was. They say that the government was charged $70,000 by mistake, but $70,000 actually was the price everybody else paid. There's no allegation of intentionality. Even if that was the claim submitted to the government, maybe it was a mistake because that's what every other – but they just don't allege any of these things. And I think it's an example of why this Court has always required – has required plaintiffs to actually point to real false claims submitted to the government, not just internal documents, because we don't know what representations were made to the government in that or any other instance that they point to. Okay. Thank you very much. We will hear from Mr. Rand. Thank you, Your Honor. You have reserved two minutes for rebuttal. We will try to keep it pretty narrowly to two because we kept you both up for a long time. So, Judge, your greatest hits. I absolutely will, Your Honor. First of all, I think Judge Perez is right that the defendants are actually asserting a beyond toothy standard on this review. I would point out that the Church's case, a relaxed pleading standard applies when claims are uniquely within the defendant's knowledge and control. How is that true here, though? I mean, your client was an insider, right? She was a reimbursement manager? But she wasn't. She didn't handle the invoice. She didn't handle it, but why would she not have had access to it? She had access. I mean, we're getting those spreadsheets and forms and all this. She has access to all this stuff. Yeah, but not – there's not a lot of actual invoices because she didn't have access to them. Okay. Is that alleged in the complaint specifically, that she did not have access to invoices? It sets out her role, and it doesn't actually state she didn't have access to invoices, but her role is such that she didn't, in fact, have. I mean, Church's is a much simpler case in a way, right, because you have the ambulance driver, who's the relator, who says, I was specifically told to falsify the facts about these ambulance rides so that they could qualify for Medicare and Medicaid payments, when, in fact, they would not have qualified if I put down the true facts. And I don't know what they billed or didn't bill, but they did tell me that that's why I was supposed to falsify this. But I wasn't even allowed in the building where the billing was done, and the people who were doing the billing had no access to any true form on which I had originally filled out what really happened. That seems to be a pretty strong situation, at least it seemed to me when I wrote that opinion, that that was a very strong indication that these falsifications were being made, point one, for the sake of billing to Medicare and Medicaid, and point two, that there was a deliberate establishment of complete separation between the people who did the billing and the people who knew the true facts who were required to submit false facts to the person who did the billing. That's not quite what we have here, it seems to me, right? I mean, the issue is your client was an insider who seemed to have access to all kinds of financial files here, and what we get is a sort of hodgepodge of hard-to-read documents. Certainly, George's was a clear case, Your Honor, no question about it. But let me just say that if she had had invoices and access to invoices, she would have included them. Do you think that you still prevail if we decide that 9B applies, at least on the reverse point? I do, Your Honor. Okay. And I think the strongest case, and it's cited a lot by the defendants, is Geldman. Which is a non-presidential opinion. It's non-presidential. And I would point out the Geldman opinion actually didn't mention the ACA at all in its reverse false claims act analysis. So this interplay between the Affordable Care Act and the reverse false claims statute, which I think is critical to the disposition of this case, wasn't even addressed by the Geldman court. Thank you very much to both counsel. Thank you, Your Honor. If there are no more oral arguments, we will take the case under advisement.